**UNITED STATES of America ex rel. Robert D. ACKLEY, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, et al., Defendants.**

**No. Civ. PJM 97–3189.**

United States District Court, D. Maryland.

Nov. 17, 1999.

Walter G. Birkel, Tighe, Patton, Taback-man & Babbin, LLC, Washington, D.C., Dean Francis Pace, Pace and Rose, Los Angeles, CA, for plaintiffs.

Kimberly King Hartwell, Michele T. St. Mary, Thomas P. Humphrey, Crowell & Moring, LLP, Washington, D.C., for defendants.

## OPINION

MESSITTE, District Judge.

### I.

Robert D. Ackley brings this suit as a relator under the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*[1] He alleges that International Business Machines Corporation (IBM) systematically defrauded the United States in connection with a subcontract to provide labor and materials for the deep space orbiting space station known as Space Station Freedom (Space Station). Ackley says that IBM's schemes included the submission of false financial reports to cover improperly allocated costs, false periodic reports of progress in order to claim unearned performance fees, and the false presentation of massive cost overruns. He further complains that IBM and Lockheed Martin Marietta (Lockheed), IBM's successor in interest on the subcontract,[2] un-

---

1. The Government has declined to intervene in this proceeding.

2. Lockheed is sued in Count III only, for retaliation. Lockheed is the successor in in-terest to Federal Systems Company (FSC), the wholly owned division through which IBM operated to obtain contracts from the United States and the National Aeronautical Space Administration (NASA). (FSC was initially

lawfully retaliated against him in violation of the anti-discrimination provisions of the Act.

Defendants have moved to dismiss Counts I and II of the Second Amended Complaint, which respectively allege false claims for payment or approval under 31 U.S.C. § 3729(a)(1) and false records and statements under 31 U.S.C. § 3729(a)(2).[3] They argue, pursuant to Fed.R.Civ.P. 12(b)(1), that Ackley has failed to establish subject matter jurisdiction in this Court and in any event has failed to plead fraud with the particularity required by Fed. R.Civ.P. 9(b).

Since it is dispositive, the Court need only deal with the first of these arguments. For the reasons hereafter stated, the Court has determined to GRANT Defendants' Motion.

## II.

Ackley is a former employee of IBM at its FSC facility in Owego, New York. IBM, a multi-national corporation with its principal place of business in Armonk, New York, is the world's largest supplier of advanced information processing technology. It is also a dominant manufacturer of main frame computers and a major supplier of minicomputers, related equipment and software.[4]

From time to time IBM, through FSC, won contracts to supply goods and services to NASA. In 1987, through FSC, it bid for and won a subcontract from McDonnell Douglas Aerospace Corporation to provide labor and materials for the Space Station Freedom project. Space Station was a $12 billion, 30 year undertaking to launch an orbiting research laboratory capable of providing scientific knowledge about how humans might work and live in space for extended periods of time. IBM's task was to design and install the hardware and software to support Space Station's on-board computer system and to serve as overall software technical manager for the project.

Ackley alleges that, beginning with its bid for subcontract work on Space Station, IBM engaged in a pattern of fraud regarding its submissions to NASA. During the bid process IBM is said to have "feigned a high risk approach" to the contract which it never intended to execute. Instead, says Ackley, IBM counted on expanding its scope of work through numerous contract modifications initiated after the contract was secured. As part of the scheme, IBM senior managers allegedly instructed FSC employees to improperly charge the Space Station project for time spent in pursuit of other commercial and government business opportunities, with the result that IBM billed NASA and received compensation for work wholly unrelated to Space Station.

As a program manager for the project, Ackley says he received complaints from engineers working on the project that their supervisors were pressuring them to allocate non-billable and other unrelated time to the project. He says he complained about this to senior management at FSC but that his complaints were ignored. Eventually, he contends, he was retaliated against even as IBM, through various employees, continued to submit improper invoices to NASA for labor and expenses unrelated to the Space Station project.

On September 7, 1995, Ackley filed the present suit in the United States District

taken over by Loral Corporation, then by Lockheed. Loral is not a party to this suit.) Ackley alleges upon information and belief that Lockheed assumed responsibility for the negotiations leading to the termination of the Space Station subcontract and that it benefitted monetarily from IBM's purported false claims during the period of IBM's control.

3. The Court understands that, at least to this point, Count III, the retaliation count, remains unchallenged. See 31 U.S.C. § 3730.

4. Lockheed, also a multi-national corporation, is one of the world's largest defense contractors.

Court for the Eastern District of Pennsylvania. The suit, proceeding in two counts, named only IBM as defendant.[5] As is customary in FCA cases, the complaint was filed under seal. *See* 31 U.S.C. § 3730(b)(2). At the request of the United States, the period of sealing was extended several times. Ultimately, however, by notice filed in the Pennsylvania court on May 6, 1997, the United States gave notice of its intention not to intervene in the suit.

On August 12, 1997, through new counsel, Ackley filed a First Amended Complaint in the Pennsylvania court.[6] That same day, Ackley's new counsel applied to the court for a transfer of the case to the United States District Court for the District of Maryland (Southern Division), described by him as "the focal point of witnesses, documents and parties," as well as the headquarters of Lockheed, successor to FSC, and the locus of NASA's Goddard Space Center. The next day, August 13, 1997, the Pennsylvania court signed an order transferring the case to this Court and the case soon after arrived here. Summonses were promptly issued to Defendants.

IBM responded promptly by filing a Motion to Dismiss accompanied by its own Motion to Transfer, this time to the U.S. District Court for the Northern District of New York. In early 1998, the Court denied IBM's Motion to Transfer.

On March 16, 1998, Ackley filed a Second Amended Complaint, adding Lockheed as a defendant.[7] IBM and Lockheed then filed a Motion to Dismiss the Second Amended Complaint.

On July 6, 1998, at oral argument on the Motion, the Court determined that limited discovery was in order with regard to the jurisdictional arguments raised by IBM. Accordingly, Defendants' Motion to Dismiss was denied without prejudice so that the parties might develop a more complete record as to these critical threshold issues. Following a period of limited discovery, IBM/Lockheed renewed their Motion to Dismiss and Ackley filed his opposition.

Additional facts will be noted in the course of this Opinion.

### III.

A) The FCA authorizes either the Government or a private party to bring a civil action to recover money that has been obtained from the United States on the basis of false claims. 31 U.S.C. § 3730(a)(b). Although the damages and penalties authorized by the statute are the same whether the Government or the relator brings suit, if suit is brought by the relator, the Government has to share its recovery with that relator in an amount, depending on the circumstances, ranging from 15 to 30%. *Id.* § 3730(d). "The FCA ferrets out fraud on the government by offering an incentive to persons with evidence of such fraud to come forward and disclose that evidence to the government." *United States ex rel. Detrick v. Daniel F. Young, Inc.,* 909 F.Supp. 1010, 1015 (E.D.Va.1995). Suits brought by a private party on behalf of the Government are called *qui tam* suits from the first two words of the Latin phrase which translates as "Who sues on behalf of the King as well

---

5. Count I alleged submission of false claims in violation of 31 U.S.C. § 3729 and Count II alleged discrimination against an employee for aiding an investigation in violation of 31 U.S.C. § 3730.

6. In the First Amended Complaint, three causes of action were alleged: Count I, violation of 31 U.S.C. § 3729, submission of false claims; Count II, violation of 31 U.S.C. § 3730, retaliation; and Count III, presumably based on the common law, wrongful constructive termination. Again, only IBM was named as defendant.

7. The Second Amended Complaint, the one currently operative, not only added Lockheed but restructured the counts. Count I alleges violation of 31 U.S.C. § 3729(a)(1), submission of false claims; Count II alleges violation of 31 U.S.C. § 3729(a)(2), use of false records and statements; and Count III alleges violation of 31 U.S.C. § 3730, retaliation.

as for himself," *Black's Law Dictionary* 1251 (6th ed.1990).[8]

A standard defense in *qui tam* suits is the public disclosure bar, which provides that no court shall have jurisdiction when the allegations of fraud are based on publicly disclosed transactions unless the person bringing the suit is the "original source" of the information involved. *See generally* Robert L. Vogel, *The Public Disclosure Bar Against Qui Tam Suits,* 24 Pub.Cont.L.J. 477 (1995). Relevant portions of the applicable statute, 31 U.S.C. § 3730(e)(4)(A) and (B), read as follows:

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

There is no question that the defense goes to the jurisdiction of the Court. *See, e.g., United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339 (4th Cir. 1994):

Under the terms of section 3730(e)(4), Siller's action was properly dismissed only if (1) it was "based upon" the allegations against BD in the SSI suit; (2) the SSI suit's disclosure of these allegations constituted a "public disclosure" in a "civil ... hearing"; and (3) Siller was

not an "original source," either because he did not have "direct and independent knowledge of the information on which the allegations were based" or had not "voluntarily provided the information to the Government" before he brought his suit.

21 F.3d at 1347.

B) Defendants seek to invoke the public disclosure bar in the present case. They argue not only that there was public disclosure of the facts and transactions Ackley bases his claims on, but that Ackley fails to qualify as an original source because he lacks direct and independent knowledge of the facts and transactions and because he did not voluntarily provide his information to the Government prior to filing suit. Ackley denies his allegations are based on public disclosures but, to the extent that they may be, claims he is an original source because he had the requisite direct and independent knowledge. He also says he made appropriate voluntary disclosures to the Government prior to filing suit.

C) The party seeking to invoke a federal court's jurisdiction, typically the plaintiff, bears the burden of establishing subject matter jurisdiction. There is no presumption of jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Pinkley, Inc. v. City of Frederick, Md.,* 191 F.3d 394, 399 (4th Cir.1999). Subject matter jurisdiction either exists or it does not. Accordingly, any party may raise it at any time. *Cf. United States v. White,* 139 F.3d 998, 999–1000 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998); *Napoleon Hardwoods, Inc. v. Professionally Designed Benefits, Inc.,* 984 F.2d 821, 822 (7th Cir.1993).

---

**8.** The full Latin phrase is "qui tam pro domino rege quam pro si ipso in hac parte sequitur." *Id.*

A Rule 12(b)(1) motion to dismiss is not limited to challenges to jurisdiction appearing from the face of the complaint. In considering the allegations, the court may consider extrinsic evidence and, if such evidence is disputed, may weigh and determine the facts. *Thigpen v. United States,* 800 F.2d 393, 396 (4th Cir.1986), *overruled on other grounds, Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988); *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir. 1987) ("the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims"). When jurisdictional facts are disputed, no presumption of truthfulness attaches to the plaintiff's allegations. *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n.,* 149 F.3d 679, 685 (7th Cir.1998) ("The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question.")

Against this background, the Court considers the jurisdictional basis for Ackley's suit.

### IV.

A) As a matter of threshold concern, the Court must decide which of Ackley's three complaints—his Initial, First Amended, or Second Amended—it should look to determine subject matter jurisdiction. Defendants' view is that the Court is obliged to confine its consideration to the Initial Complaint, citing several cases in support of this proposition. *See, e.g., Federal Recovery Servs., Inc. v. United States,* 72 F.3d 447, 453 (5th Cir.1995). Ackley, for some reason, has not responded to this argument but simply assumes the applicability of the Second Amended Complaint.

The Court is inclined to agree with Defendants' view, but for reasons that differ slightly from those of Defendants. Despite Defendants' case citations, the matter seems to be more one of fact than

of law. An initial complaint can ordinarily be amended, under appropriate circumstances, to permit further averments for purposes of establishing a court's jurisdiction. *See, e.g., Cades v. H & R Block, Inc.,* 43 F.3d 869, 873 (4th Cir.1994). But in the present case the Court is called upon to decide what is the most dependable evidence bearing on the question of whether Ackley has based his claim on public disclosures and, if he has, what is the most dependable evidence indicating the extent to which he possesses the requisite direct and independent knowledge to qualify as an original source. The Court finds as a jurisdictional fact that the Initial Complaint is the best evidence of this. Here is why:

Both the First and Second Amended Complaints were formulated after Ackley had the benefit of discovery. As a result they may well contain information obtained by way of discovery that skews the picture of what information Ackley actually derived from public disclosures and what he may be an original source of. Thus, reference for the first time in the amended complaints to recently discovered information that was publicly disclosed previously permits Defendants to argue that Ackley's allegations were derived from those public disclosures whether or not they in fact were, hence that the public disclosure bar should apply. On the other hand, reference for the first time in the amended complaints to recently discovered information also permits Ackley to argue, for original source purposes, that he has more direct and independent knowledge than he may in fact have. The confusion may flow from the fact that, if there is no public disclosure bar, Ackley is permitted to plead any allegations of fraud he cares to, from whatever source and whenever obtained, so long as the allegations are pleaded with appropriate particularity. *Detrick,* 909 F.Supp. at 1018. At the same time, even if there has been public disclosure, so long as Ackley possesses direct and independent knowledge of a core of

the same information, he can still plead these publicly disclosed matters, again so long as the matters are set forth with the required particularity. *Id.* at 1019.

The problem is that, in his First and Second Amended Complaints, Ackley has folded in a number of allegations of fraud on the assumption either that there has been no public disclosure or that the original source exception applies. At this juncture, however, those are precisely the questions to be answered. What information, if any, did Ackley derive from public disclosures and what, if any, did he have direct and independent knowledge of before filing suit? The Court finds that Ackley's Initial Complaint, the one framed before any possible distortions associated with discovery took place, is the most reliable evidence of this.

B) The FCA provides that suits consisting of allegations or transactions "based upon" certain public disclosures will be barred unless the action is brought by the Attorney General or the person bringing the action is an "original" source of the information. 31 U.S.C. § 3730(e)(4)(A).[9] Allegations or transactions are publicly disclosed when they are the subject of "a criminal, civil, or administrative hearing, ... a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or ... [a] news media [report]." *Id.*

While a number of Circuits have held that the public disclosure bar applies if there is a "substantial similarity" between the publicly disclosed allegations and those of the suit, see, e.g., *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 681–85 (D.C.Cir.1997), the Fourth Circuit has definitively ruled that the bar applies only when the relator "actually derived" his knowledge from the

public disclosure. *Siller,* 21 F.3d at 1347–48 (1994).

According to the Fourth Circuit, "such an understanding of the term 'based upon' ... is fully consistent with § 3740(e)(4)'s indisputed [sic] objective of preventing 'parasitic' actions ... for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic." *Id.* at 1348 (citation omitted). Whatever Defendants may believe about the soundness of this decision and however contrary it may be to the law in other Circuits, it is the prevailing rule in this Circuit and this Court is bound to follow it.

C) *Siller,* however, offers no guidance on the issue of whether, for the bar to apply, the information derived by the relator must be total or need only be partial. Defendants argue that allegations even partially based upon (*i.e.* derived from) public disclosures will suffice for imposition of the bar. Ackley disagrees.

In *Siller,* the Fourth Circuit did not reach the issue, as the following passage in the decision makes clear:

None of these cases, however, actually addresses the specific question whether a *qui tam* relator need have derived his knowledge of the factual basis of his action from a public disclosure in order for his action to be "based upon" that disclosure. *Rather, each of these cases addresses the question whether a qui tam action that is only based in part on publicly disclosed information should be deemed to be "based upon" the public disclosure under section 3730(e)(4)(A).* The extent to which a *qui tam* action must be "based upon" a public disclosure is, of course, distinct from the ana-

9. Public disclosure of either an allegation or a transaction satisfies the public disclosure standard:

It is clear that the FCA's reference to "allegations or transactions" is in the disjunctive, so that disclosures which reveal either

the allegations of fraud or the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar. *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3rd Cir.1997).

lytically antecedent question of what it means for an action to be "based upon" a public disclosure.

*Siller,* 21 F.3d at 1349 (emphasis added). Nor did the *Siller* Court, in directing the district court on remand to address the factual question of "whether Siller actually derived his allegations from the SSI suit," give any instruction as to whether the allegations must be derived in whole or need only be in part from the prior suit. *Id.* The court, however, did rely upon a "straightforward textual exegesis" to conclude that "[t]o 'base upon' means 'to use as a basis for.'" *Siller,* 21 F.3d at 1348 [ (quoting *Webster's Third New International Dictionary* 180 (1986) (emphasis added) ]. Using a similar "straightforward textual exegesis," one could infer that the court was saying "a" basis, but not the only or sole basis will suffice.

In any event, in the *Detrick* case Judge Ellis found *Siller* no impediment to recognizing a "partially based upon" rule. Acknowledging *Siller,* Judge Ellis expounded:

> The second paradigm path a complainant may follow on the road to relator status under the FCA arises where the complainant's fraud allegations are derived from, or based *in part or in whole on,* public disclosures. This situation triggers the FCA's "original source" provision, which requires, as a jurisdictional condition, that the complainant have knowledge of the fraud that is direct and independent of any public disclosures.

*Detrick,* 909 F.Supp. at 1019 (emphasis added) (citation omitted). This view, as it happens, accords with the holding of every Circuit that has addressed the issue. Suits based even in part upon publicly disclosed information have been deemed subject to the public disclosure bar, not just those based solely on such information. *See United States ex rel. McKenzie v. BellSouth Telecomm., Inc.,* 123 F.3d 935, 940 (6th Cir.1997), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755

(1998); *Federal Recovery Servs.,* 72 F.3d at 451; *Cooper v. Blue Cross and Blue Shield of Florida, Inc.,* 19 F.3d 562, 567 (11th Cir.1994); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1158 (2d Cir.1993); *United States ex rel. Precision Co. v. Koch Indus.,* 971 F.2d 548, 553 (10th Cir.1992). This construction rests not only upon the plain words of the statute; it also flows from the general rule that jurisdictional statutes must be strictly construed. *See Precision Co.,* 971 F.2d at 552 ("Congress chose not to insert the adverb 'solely', and we cannot, because to do so would dramatically alter the statute's plain meaning.")

The Court, moreover, believes practical considerations favor application of a "partially based on" rule. If a complaint had to be totally derived from public disclosures for the bar to apply, a relator could avoid the bar simply by adding a few previously undisclosed facts or transactions (*e.g.* one or two false billings) to a number of previously disclosed ones, then proceed without having to demonstrate his direct and independent knowledge of any of the transactions. On the other hand, a potential logistical nightmare would ensue if the Court were required, at the inception of the case, to pick and choose among those facts derived from public disclosures and those not so derived, and then to try the case requiring proof of direct and independent knowledge as to some facts but not as to others—particularly in cases where many facts and transactions are likely to be interwoven. Since the only consequence of holding that partial derivation of allegations from public disclosures raises the bar is that the relator has to show that he has direct and independent knowledge of the facts, application of the partial derivation rule seems on balance to be reasonable. The relator who has truly derived no part of his information (or substantially none) from public disclosures would continue to get a pass to proceed without demonstrating his direct and independent knowledge of the transactions.

Any other relator would simply have to demonstrate the direct and independent basis of his knowledge of the various claims.[10]

■ The Court concludes that allegations partially based upon (*i.e.* partially derived from) public disclosures suffice for imposition of the public disclosure bar.

The next question for the Court to decide is whether Ackley's Initial Complaint is in fact partially derived from publicly disclosed sources.

## V.

The Court finds that Ackley did actually derive a substantial portion of his Initial Complaint from allegations or transactions publicly disclosed in Congressional hearings and the news media.

A) On March 2, 1993, the Subcommittee on Space of the Committee on Science, Space and Technology of the U.S. House of Representatives convened a hearing on potential space station cost overruns.[11] The next day the *Washington Post* reported that "NASA paraded its dirty linen before Congress at a contentious hearing yesterday in which agency officials attempted to trace the labyrinthine paths that led to a potential $1 billion overrun in the space station program." Kathy Sawyer, *Space Station Officials Queried on Overruns*, Wash. Post, March 3, 1993, at A10.

IBM's cost overruns were very much a subject of the hearings. Anthony J. Macina, Vice–President and General Manager of FSC, Head of the IBM Space Station subcontract, and Ackley's overall supervisor, was a major witness.

Ackley's Initial Complaint refers to these hearings in detail:

10. At that point, however, an "original source" analysis would appear to be required as to each claim. *See, e.g., Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1472–76 (9th Cir.1996).

In fact, in March, 1993, before it was terminated from the Space Station project, IBM conceded to the United States Congress that the initial $251 million contract that the Government awarded to IBM ultimately would cost the Government in excess of $800 million.

\* \* \* \* \* \*

On March 2, 1993, an IBM senior manager [Macina] testified before the United States House of Representatives' Subcommittee on Space in an effort to explain IBM's exorbitant cost overruns. The Subcommittee, however, was unimpressed with IBM's excuses, and later that year terminated IBM from the Space Station Freedom project even though hundreds of millions of dollars already had been spent on IBM's portion of the Space Station project.

Congress was so enraged with IBM's cost overruns that it scrapped *all* of IBM's work and engaged another contractor to completely recreate IBM's work on the project. Before it was terminated, however, IBM was paid over $270 million for work it allegedly performed on the Space Station project (emphasis in original).

In the Disclosure Statement he submitted at the time his suit was filed on September 7, 1995, Ackley elaborated:

The written statements [submitted by the Space Station contractors and subcontractors] revealed that IBM was responsible for the majority of the contractor-initiated cost overruns. In his prepared statement, Mr. Macina admitted that as of March, 1993—less than six years into the project—IBM had negotiated 32 subcontract changes with McDonnell Douglas and planned to negotiate 16 additional subcontract changes in the coming months. The

11. *Review of Potential Space Station Cost Overruns: Hearing before the House Subcomm. on Space of the Comm. on Science, Space and Technology,* 103d Cong. 1–139 (1993) (hereinafter "1993 House Hearings").

statement also revealed that despite having billed the government in excess of the original $251 million contract price, IBM only had completed 50% of the required systems software under the subcontract with McDonnell Douglas.

Mr. Macina advised the Subcommittee that the projected final cost of IBM's work on work package 2 was approximately *$800 million.* An itemized report of the contract cost overruns revealed that in excess of $130 million of the contract cost overruns were attributable to IBM' s requests for so-called "Equitable Adjustments" to the subcontract. The prepared statement also suggested that approximately $325 million of additional contract costs were the result of contract scope changes initiated by NASA.

In fact, IBM represented to the Subcommittee that NASA was responsible for 73% of the growth experienced in IBM's subcontract with McDonnell Douglas:

> Scope growth through customer Technical Direction (TD) followed by Subcontractor Notices (SCCNs) has accounted for 73% of the overall growth in the IBM subcontract. The remaining 27% has been due to requests by IBM for fair and equitable adjustments to [IBM's] contract value.
>
> ... IBM also suggested that McDonnell Douglas was responsible for a major component of the contract cost overruns because it effected numerous changes to the type and quality of the hardware required to support Space Station's data management system. Nowhere in Mr. Macina's remarks or in the prepared statement did IBM admit that it was responsible for the contract growth (emphasis in original).

B) On July 27, 1994, the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the U.S. House of Representatives opened separate hearings on "Space Station Contracting."

Chairman Dingell was particularly accusatory of IBM, as reflected in his opening statement:

> Audits conducted by GAO, NASA Inspector General, and by the DCAA [Defense Contracting Audit Agency] have shown that the contractors were routinely submitting incomplete and inaccurate cost reports essential for monitoring and controlling costs.
>
> * * * * * *
>
> [A]nother Space Station subcontractor, IBM, engaged in highly questionable billing practices. Of the $490 million of costs incurred by this contractor over 7 years, DCAA is questioning $107 million as unallowable.
>
> IBM, without authorization, spent $40 million for equipment, among other things, that they knew were being provided by another contractor. DCAA found this "unnecessary and duplicative" and therefore unallowable.
>
> IBM also charged $20 million to the Space Station for leasing a building that IBM already owned. This matter is under criminal investigation by the U.S. Attorney in Houston.[12]

In addition, a witness before the Committee testified that IBM was the only one of 10 contractors who refused to provide DCAA with information about management expenses, bonuses and work fees.

The next day, July 28, 1994, the *Los Angeles Times* reported that "an audit of charges by IBM, a subcontractor to McDonnell Douglas, found that about 20% of IBM's $490 million in charges over a several-year period were not allowable under its contract." Ralph Vartabedian, *NASA Admits Boeing Failed Cost Reviews,* L.A. Times, July 28, 1994, at D1.

12. *Space Station Contracting: Hearing before the House Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce,* 103d Cong. 2–3 (1994) (hereinafter "1994 House Hearings").

C) While referring to the 1993 House hearings in his Initial Complaint,[13] the only other source suggested for Ackley's information about IBM's alleged fraud is his personal knowledge, *viz.*, that he was allegedly advised by certain personnel on the Space Station project that they had been pressured by their supervisors to allocate non-billable and other unrelated time to the project. The Initial Complaint cites no source for Ackley's allegation that IBM deliberately set out to "lowball" the Space Station subcontract or that it then began billing and receiving compensation for unrelated work.

Ackley's Disclosure Statement clarifies the matter somewhat but very little. He states that he began working on IBM's bid submission in response to McDonnell Douglas' Request for Quotation on the Space Station project and "was instructed to underbid the competition" in order to insure IBM's receipt of the contract.[14] He says he was told that "over time IBM would expand the scope of its work by effecting periodic modifications."[15] He names three individuals whom he says "informed their subordinates that IBM's role on the project would increase substantially over the life of the project ... [and] that IBM expected to parlay the $251 million McDonnell Douglas subcontract into a $1 billion windfall." He also states that supervisors on the Space Station subcontract "began pressuring their subordinates to reallocate substantial blocks of non-Space Station labor hours to the Space Station contract account." He says that in early 1993, a number of engineers and specialists complained to him about this pressure to bill unrelated commercial contract time.

Beyond this, neither the Initial Complaint nor the Disclosure Statement in any way suggest that Ackley was involved in IBM's billing process nor that he knew about any particular false or fraudulent claim "resulting from the various schemes undertaken by Defendant IBM" as set forth in his prayer for relief. Nowhere does the Initial Complaint reflect knowledge on his part about cost overruns, false reporting in general, false NASA Form 533 reports, mischarges for new business and for bid and proposal expenses, the shifting of independent research and development costs to Space Station, improperly charged travel expenses, or mischarges for various costs of materials, all purported misdeeds Ackley mentions prominently in his Second Amended Complaint.

D) On the other hand, the evidence that Ackley derived a substantial portion if not all of the allegations and information in his Initial Complaint from public disclosures is ample.

First, as indicated, the Initial Complaint cites extensively to the 1993 House hearings. The contemporaneous Disclosure Statement does likewise. Ackley agrees that he reviewed the Initial Complaint and that he participated in developing the Disclosure Statement. As Defendants point out, when asked on deposition if his Initial Complaint at paragraph 48 reporting the 1993 Congressional testimony was based upon Congressional testimony, Ackley's counsel interjected:

> By definition it is. It talks about the prepared statement.

Further, Ackley admitted on deposition that the reference to the $130 million in cost overruns at Paragraph 49 of the Initial Complaint, to the $186 million in contract changes at Paragraph 50, and to the "73%" growth of the IBM subcontract at

---

**13.** Ackley does not reference the 1994 House Hearings in the Initial Complaint.

**14.** *Quaere* how Ackley might know what the competition was bidding so as to be able to do this.

**15.** Outright fraud aside, for a government contractor to contemplate—even anticipate—favorable modifications over the life of a long-term government contract, especially a multibillion dollar one involving an experimental project, would seem neither unusual nor illicit.

Paragraph 51, were all based on Congressional testimony.

Another reason to conclude that Ackley actually derived a good measure of his allegations from publicly disclosed sources is, frankly, his doubtful credibility on the matter of how extensive his personal knowledge of IBM's actions actually is. The Court is highly skeptical, in light of Ackley's admitted reliance on the just mentioned public sources, of the statement he made in an earlier affidavit to the Court that he "did not rely on *any* public sources of information or derive any of the information that I provided the Government or included in my complaints from the· news media, or any other source" (emphasis added). Indeed it is noteworthy that, after suit was filed but before the case was unsealed, Ackley's attorneys issued wide-ranging discovery subpoenas in an effort to secure the testimony of key NASA employees and to obtain the production of a vast number of documents. Among other things, Ackley sought depositions of NASA contracting officers and Rule 30(b)(6) witnesses, as well as NASA documents pertaining to its settlement with IBM and "any false IBM proposals, certification statements, reports and/or invoices known to the NASA contracting officer." [16] While Ackley's request for this information may have been largely motivated, as he contends, by a desire to keep abreast of settlement discussions between NASA and IBM, these pre-filing discovery efforts also tend to suggest that Ackley may have felt the need to shore up what he sensed was an insubstantial base of direct and independent knowledge of transactions apart from the public disclosures.

Finally, the most telling evidence of his reliance on public disclosures may be found in Ackley's now superseded First Amended Complaint. That pleading contains a section entitled "STANDING OF RELATOR TO SUE AS ORIGINAL SOURCE." It goes on to recite that "Plaintiff and Relator ACKLEY is the Original Source of all the false claims by Defendant IBM pursuant to False Claims Act ... on grounds that Plaintiff ACKLEY had direct and independent knowledge of the false claims by Defendant IBM which he acquired during the course of his employment at Defendant IBM." The pleading in no way contends that Ackley's claims are not based on public disclosures, which would have avoided imposition of the public disclosure bar. Instead, the implication is that Ackley himself understood that the public disclosure bar presented an obstacle he could not overcome, hence it was necessary to assert his standing directly based on the original source exception. While this is a position from which Ackley has certainly retreated since filing his Second Amended Complaint, it stands as a matter of record nonetheless.

On the basis of all these indicia, the Court concludes that Ackley derived a substantial portion of his allegations and information about this case from publicly disclosed sources. He therefore can survive a dismissal only if he can establish his status as an original source.

## VI.

■ To qualify for the original source exception to the public disclosure bar: (1) the relator must have direct knowledge of the information, (2) the knowledge must be independent and (3) it must have been voluntarily disclosed to the Government before suit was filed.

Courts have issued various opinions on the meaning of "direct" and "independent" knowledge. *See, e.g., U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991) ("Direct" signifies " 'marked by absence of an intervening agency' ") (quoting *Webster's Third New International*

---

**16.** Enforcement of the subpoenas was stayed while the case was sealed. During the limited discovery period authorized by this Court, Ackley renewed his subpoenas for similar documents.

*Dictionary* 640 (1976)); *Houck on Behalf of United States v. Folding Carton Admin. Comm.*, 881 F.2d 494, 505 (7th Cir.1989) ("Independent knowledge" is knowledge not itself dependent on public disclosure). The present case might have provided an occasion for yet another court to attempt to examine the meaning of those terms.

However, because Ackley's case ultimately falters on the third element—voluntary disclosure of the information to the Government before filing suit—it is unnecessary to pursue further analysis of the first two elements. The Court will assume without deciding that Ackley had direct and independent knowledge of at least some of his averments apart from what he derived from public disclosures.

The Court turns to the requirement that the relator must have voluntarily disclosed his information to the Government prior to filing suit.

### VII.

■ The principal point to emphasize, yet again, is that the requirement of voluntary disclosure is a jurisdictional one.[17] No case in which there has been public disclosure may be entertained by the district court unless, besides the relator having direct and independent knowledge, he has made voluntary disclosure of the information to the Government before filing suit. As a jurisdictional prerequisite, any defendant can raise it. *See* Fed.R.Civ.P. 12(h)(3); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1393. Ackley's suggestion that only the Government can raise the defense because the requirement "exists for the benefit of the Government" is legal fantasy and the Court gives it no credence.

### VIII.

What, then, does the provision mean? Parsing the clause, it is clear that there must be:

1) a disclosure

2) of information

3) to the Government

4) that is voluntarily made

5) before suit is filed.

The Court begins with the plain meaning of the words. *See United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986). Combining the dictionary definitions of the words as they appear in Webster's Encyclopedic Unabridged Dictionary of the English Language (1994 ed.) and considering the words as they relate internally to the rest of the statute, the rule might be reformulated as follows: The relator must reveal the facts and circumstances on which the allegations or transactions of his complaint are based/to an appropriately responsible government or official agency/of his own accord and free choice/at a time preceding the filing of the litigation.

Courts have addressed some but not all of these elements. Thus, for example:

● Although the facts and circumstances must be pleaded with the "who, what, when, where, and how" particularity of Fed.R.Civ.P. 9 pertaining to pleading fraud, only a "core of knowledge" need be communicated, not a comprehensive whole. *Detrick*, 909 F.Supp. at 1020, 1022.

● "Voluntarily" means not in response to a subpoena, see, e.g., statement of Senator Grassley, sponsor of the 1986 amendments at 132 Cong.Rec. § 11244 (daily ed. Aug. 11, 1986), and, insofar as a government employee is concerned, not in exchange for a salary. *See, e.g., United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 744 (9th Cir.1995).

Until recently, "[n]otwithstanding the plain language of Section 3730(e)(4)(B), no court has interpreted this provision to re-

---

**17.** That is, under 31 U.S.C. § 3730(e)(4)(B), it is jurisdictional. There is a separate disclosure requirement under § 3730(b)(2) which is more procedural in nature. Under the latter provision, along with a copy of the complaint, "a written disclosure of substantially all material facts must be served on the Government." The latter provision is not a present concern.

quire disclosure to the Government *prior* to filing a complaint." John T. Boese, *Civil False Claims and Qui Tam Actions* 4–71 to 4–72 (1998 Supp.) (emphasis in original). Precisely that issue, however—the extent to which disclosure prior to filing a complaint is required—confronts the Court in the present case.

As to this, plain meaning analysis can take the matter only so far, a point well-demonstrated by the very argument Ackley makes in this case, *viz.,* that since the statute does not say how long "before" filing the disclosure must be made, it may be made at any time prior, literally a moment or two prior. Such an argument, however, leads to an obviously absurd result since, at the time of the filing of the complaint, a formal written disclosure statement must also be filed. It makes no sense at all to require what might be a disclosure, oral or written, to be made a few seconds before a written one is required to be filed. The Court can only conclude that a greater period of time must have been contemplated.

Legislative history, as is frequently the case, sheds no light on the matter. Senator Grassley's previously cited remarks say nothing about the timing of the disclosure.

In the literature, on the other hand, it has been argued that the voluntary requirement means that there must be voluntary disclosure *prior* to the public disclosure; otherwise, a relator could comply with the requirement by producing information "minutes before the suit is filed." Robert Salcido, *Screening Out Unworthy Whistleblower Actions: An Historical Analysis of the Public Disclosure Jurisdictional Bar to Qui Tam Actions Under the False Claims Act,* 24 Pub.Cont.L.J. 237, 288–89 (1995). Such a reading, however, in light of *Siller,* is unavailable in the Fourth Circuit since there is plainly no temporal nexus between a relator's direct and independent knowledge and the public disclosure. All that matters in the Fourth Circuit is that the relator's knowledge be direct and independent of the public disclosure, not actually derived from it.

Still, one quite reasonable purpose ascribable to the requirement of voluntary disclosure "before" filing suit seems likely—that is, to make the relator bring his knowledge to the attention of the Government at the earliest possible date. This is precisely what the Seventh Circuit said in the recent case of *United States v. Bank of Farmington,* 166 F.3d 853 (7th Cir.1999),[18] which bears quoting *in extenso:*

> To escape the jurisdictional bar, a plaintiff must, before filing her *qui tam* action, have voluntarily provided the information upon which her *qui tam* claim is based to the government if the information has been publicly disclosed. Precisely what it would mean to have voluntarily provided the information to the government before filing the lawsuit under 31 U.S.C. § 3730(e)(4)(B) is not something settled in the caselaw or clearly specified in the statute. A *qui tam* plaintiff might satisfy this requirement, for example, by notifying the United States Attorney, the FBI, or other suitable law enforcement office of the information which is the basis for the action, or by informing the agency or official responsible for the particular claim in question.... These are not exclusive methods, but it is clear that the requirement is not satisfied by informing the government at the time of filing the action, even in compliance with the requirement that a private plaintiff must provide the government, at the time of filing, with "a copy of the complaint and written disclosure of substantially all material evidence and information the person possesses...." *Id.* 3730(b)(2).

18. This relator case, brought by an individual named "Mathews," could have been styled "*United States ex rel. Mathews v. Bank of Farmington.*" The Seventh Circuit, however, has made a point of captioning the case as it appears in the text. *Bank of Farmington,* 166 F.3d at 856 n. 2.

More must be done to qualify as an original source than to file the action. The government must be voluntarily notified beforehand.... In this case, nothing in the record indicates that Mathews did anything to voluntarily provide the information on which her allegations are based to the government before filing her lawsuit. In the circumstances, then, she fails to qualify as a source, much less as an original source.

\* \* \* \* \* \*

Should jurisdiction depend upon such quirks? Do we really want a rule which says: Get your *qui tam* claim in quickly? The short answer is yes, because that is the rule Congress adopted. Where the statute makes jurisdiction depend on events which occur at determinable times, such as a public disclosure of information or its voluntary provision to the government before filing a lawsuit, a plaintiff is encouraged not to dawdle. Just as one can lose a right to sue by the running of a statute of limitations, so a court can be denied jurisdiction by such an accident of timing. But the policy rationale is clear: The "intent of the Act ... is to encourage private individuals who are aware of fraud against the government to bring such information forward at the *earliest possible time* and to discourage persons with relevant information from remaining silent." ...

*Bank of Farmington,* 166 F.3d at 865–66 (citations omitted) (emphasis in original).

This Court agrees with the *Bank of Farmington* rationale. The requirement of voluntary disclosure before filing unquestionably gives additional time to the Government to act above and beyond the time it has during the period the pleadings are sealed but after the filing of suit. During the pre-filing period, the Government not only gains more time to determine whether the relator's claims of fraud

have merit, but also to consider whether there has already been public disclosure of the matters, whether the prospective relator in fact possesses direct and independent knowledge of the matters he is disclosing, and whether he is making disclosure on a voluntary basis. In this time before filing, the Government may be able to dissuade the proponent of a meritless claim from going forward. Contrariwise, in the pre-filing period the Government can assist the proposed filer it deems to have a meritorious claim in fortifying his complaint.

■ But given this purpose, it seems inescapably clear that the point at which the pre-filing disclosure has to be made is, at a minimum, one sufficiently in advance of the time of filing to permit the Government to commence its analysis of the proposed litigation.

While fixing an exact time for the pre-filing disclosure would be arbitrary, that cannot be the end of the matter. As is often the case, a rule of reason may be inferred. Thirty days would seem reasonable in nearly every case. Quite likely two weeks would do as well. *Cf., e.g.,* Jeffrey A. Lovitky, *Qui Tam Litigation: A Practical Primer,* 35–JAN Trial 68, 72 (1999) (recommending disclosure one or two weeks before filing of complaint). What seems elementary, however, is that just a few moments, hours or days before will not do. Voluntary disclosure at some "reasonable" time before filing suit surely contemplates a number of days. However much some practitioners may choose to ignore it, the requirement of voluntary disclosure before filing suit remains part of the statute, nothing less than a jurisdictional prerequisite. The Court is not inclined to read the requirement out of the statute as a redundancy simply to promote the larger purposes of the FCA.[19]

---

**19.** The FCA is probably the least likely setting in which to ask a court to gloss over problematic language in order to promote the larger purposes of the legislation. Before the Act

was amended in 1943, the Supreme Court in the *Hess* case, based on the language then in effect, permitted a relator to copy language directly out of a public indictment and suc-

## IX.

What does the record show regarding Ackley's compliance with the requirement of voluntary disclosure before filing suit? Ultimately to his misfortune, what the actual facts may be and what the record discloses are two quite distinct matters.

Well after he was ordered to produce the documents, well after the time for briefing of motions had passed, after oral argument on the motions, and without leave of court, Ackley has filed documents that arguably establish his compliance with the voluntary disclosure-before-filing requirement. Defendants have moved to strike these supplemental submissions.

▮▮▮▮ The Court concludes it has little choice except to grant Defendants' Motion to Strike. The documents have arrived too late. As a result, there remains no competent evidence demonstrating that Ackley voluntarily disclosed the relevant information to the Government before filing suit and, in consequence, the first two counts of his suit must fail for lack of subject matter jurisdiction. This conclusion requires the Court to recount in some detail the procedural history of the case.

## X.

A) As previously noted, when Defendants' Motion to Dismiss the Second Amended Complaint was argued in July, 1998, it became clear to the Court that limited discovery pertaining to subject matter jurisdictional issues, as permitted by Fed.R.Civ.P. 56(f), was in order. Accordingly all issues going to subject matter jurisdiction were placed on the table, *viz.*, the extent to which Ackley might have based his complaint on public disclosures, the extent to which he might have direct and independent knowledge of the claims he asserted, and the extent to which he voluntarily disclosed his information to the Government prior to filing suit. To be sure, this limited discovery was as much for Ackley's benefit as for Defendants'. He was authorized to request from them specific documents that he did not have in his possession but which he contended he relied on in gaining his direct and independent knowledge.

At the same time Defendants, quite naturally, were interested in seeing any and all documents through which Ackley might have made disclosures to the Government. In opposing Defendants' First Motion to Dismiss for Lack of Jurisdiction, for instance, Ackley claimed that his allegations were detailed not only in his various complaints but also in "the more than 30 separate disclosures reported to the United States Attorney's Office during its two-year investigation." When the Court, during the hearing on the motion on July 6, 1998, told the parties it found Ackley's disclosure statements to be "right on point" on the jurisdictional issue, Ackley's counsel agreed to provide the statements to defense counsel. The Court confirmed this "offer" by Order that same day.

As it happened, on July 10, 1998, Ackley delivered just two of the disclosure statements out of the approximately 30 separate disclosure statements allegedly delivered to the U.S. Attorney's Office. One was the initial disclosure statement which accompanied the filing of the Complaint on September 7, 1995, the other was a disclosure statement entitled "Supplemental Disclosure at # 25." Defense counsel took exception to this limited production both informally and formally. By letter dated

ceed as a *qui tam* relator. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 545–48, 63 S.Ct. 379, 87 L.Ed. 443 (1943). At the other extreme, following the 1943 amendment of the Act but before the 1986 amendments, the Seventh Circuit in the *Dean* case prohibited the State of Wisconsin from becoming a relator on the grounds that the Government already had the information in its possession, despite the fact that it was the State of Wisconsin that had provided that information to the Government in the first place. *See United States ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100, 1103–04 (7th Cir.1984). In both instances, the literal language of the Act permitted results at odds with the Act's larger purposes. Nevertheless it took Acts of Congress to correct the anomalies.

August 18, 1998, they requested the rest of Ackley's disclosure statements, apparently reiterating that request at a document deposition of Ackley on August 26, 1998. On September 10, 1998, however, Ackley's counsel advised that no more disclosures would be provided.

Defense counsel thereupon filed a "Motion to Compel Plaintiff's Production of Disclosure Statements." Among other things, the motion asserted that

Contrary to the Court's order of July 6, 1998, plaintiff Robert D. Ackley ("Ackley") has withheld all but a fraction of the disclosure statements that bear directly upon the jurisdictional issue before the Court. Ackley's recalcitrance is particularly difficult to fathom, because the Court has already described such disclosures as "right on point" for the jurisdictional issue and directed production as a very *first* step in the process for jurisdictional discovery....

Throughout this case, Ackley has pointed to his disclosure statements as evidence of his personal knowledge as well as his compliance with the requirement of the False Claims Act that, prior to filing an action, a relator must voluntarily disclose to the Government the basis for his allegations in order to qualify as an "original source" (emphasis in original).

Ackley, for some reason, took the position that the Court's Order of July 6, 1998 encompassed only the original September 7, 1995 disclosure statement. Soon after, on referral from the Court, the matter went before Magistrate Judge Day, for resolution. He ruled promptly.

By letter order dated October 8, 1998, Magistrate Judge Day held that "to the extent Plaintiff intends to pursue any particular category of claims in his action, all disclosure statements that relate to said claims must be produced to defense counsel on or before October 12, 1998." The order made no distinction between statements pre-dating and those post-dating the filing of suit.

But whatever disclosure statements were forthcoming in response to Magistrate Judge Day's Order, they did not include copies of any disclosure statements that Ackley might have pre-filed with the Government. That omission, as it turned out, was unfortunate. Defendants placed special emphasis on the absence of such documents in their renewed Motion to Dismiss, arguing that Ackley had failed to demonstrate his compliance with the requirement of voluntary disclosure before suit necessary to qualify him as an original source and consequently to give this Court jurisdiction.

In his Opposition to the renewed Motion to Dismiss, Ackley pointed to the affidavit filed in April, 1998 by his former counsel, Mark Raspanti, Esquire, to the effect that a draft complaint and disclosure statement had been mailed to Joseph N. Joseph, Esquire, an Assistant United States Attorney for the United States Attorney's Office in Philadelphia, who had been assigned to investigate Ackley's case. Raspanti's affidavit also indicated that he had had conversations with Joseph about the case on June 12, 1995 and August 2, 1995 and also on June 13, 1995 with James G. Sheehan, Chief of the Civil Division, U.S. Attorney's Office in Philadelphia. According to Raspanti's affidavit, a copy of the documents provided to Joseph were also provided to Sheehan.

Nevertheless no copies of such documents were submitted to defense counsel.

IBM/Lockheed continued to insist that they had a right to see the documents. Accordingly, their counsel filed a Motion for an Order Directing Submission for an *in camera* review, which was heard by Magistrate Judge Day in a telephone conference on March 18, 1999. Defense counsel were at pains to point out to Magistrate Judge Day that they had not received a copy of a disclosure statement that was presented before the action was filed. This, defense counsel urged, was "the most critical of all ... because we

are going to argue ... before Judge Messitte in the substantive motion to dismiss that Ackley has the burden of proof, that he cannot be an original source because he hasn't disclosed to the government; he hasn't proved that he disclosed to the government before he filed the action." Ackley's counsel responded that defense counsel was "creating a bogus issue out of old cloth." Defense counsel knew about the Raspanti affidavit, he argued, but in any event, he declared, he was prepared to put in another affidavit in which Raspanti would say that the draft complaint and disclosure document delivered to Messrs. Joseph and Sheehan in August 1995 was "substantially identical to the one that was actually filed, and we don't have any copies of the draft."

At the close of the March 18 hearing, Magistrate Judge Day ruled that "if the Plaintiff suddenly produces something now that he has not to this point produced or is aware that has been produced by the government or otherwise, [Ackley] is not going to be allowed to deal with that." On March 24, 1999, Magistrate Judge Day ordered Ackley to provide Defendants within 10 days with copies of "all disclosure statements and supplemental disclosures regardless of whether Plaintiff intends to rely upon said disclosures and supplemental disclosures to establish the Court's authority to address the claims presented." Still no pre-filing complaint or disclosure statement was produced.

Meanwhile, on March 22, 1999, after having been extended several times to accommodate counsel, the briefing cycle on Defendants' Renewed Motion to Dismiss closed. Counsel began preparation for oral argument, set for April 26, 1999.

Then, on April 9, 1999, Ackley submitted a supplemental affidavit from Raspanti in which Raspanti stated that "the draft complaint and the draft disclosure statement were substantially identical to the final complaint and disclosure statement served on the Government on September 7, 1995." The affidavit was covered by a pleading entitled "Notice of Filing of Supplemental Affidavit and Motion for Leave to File." Defendants filed a vigorous opposition:

> The pending IBM/Lockheed Martin motion to dismiss for lack of subject matter jurisdiction has been fully briefed since March 22, 1999. It is a renewal of a prior motion briefed in the Spring of 1998 and argued in July of 1998. It was clear then that the motion would be renewed, after the further development of the factual record through discovery. A discovery cut-off and the briefing schedule was set by this Court's Order of July 6, 1998. . . .

> Ackley has offered no excuse for his delay in moving for leave to proffer the Supplemental Affidavit. Indeed, Ackley's efforts to characterize the Supplemental Affidavit as a "clarification" of the first Raspanti affidavit ... is inaccurate and misleading. Nothing in the first Raspanti declaration mentioning a *draft* disclosure statement provided any idea of the *content* of what information allegedly was presented to the Government before the initial complaint was filed (emphasis in original).

On April 26, 1999, the Court heard an oral argument on the Motion to Dismiss. For the sake of the argument, the Court assumed without deciding that the second Raspanti affidavit was admissible.

Even so, defense counsel continued to insist that the Raspanti affidavits, which were the only potential evidence of Ackley's voluntary disclosure to the Government prior to the filing of the complaint, did not suffice. "The words substantially identical," defense counsel argued, "are vague and ambiguous. We have a September 7th document. We don't know what Mr. Raspanti means by substantially identical. Is it 50 percent the same? Is it 75 percent the same?"

Ackley's counsel, for their part, were again dismissive, characterizing the entire argument as "an absolute red herring." They challenged the assertion that filing of

the disclosure statement before the complaint was filed was a jurisdictional requirement and, referring to the disclosure statement that accompanied the filed complaint, urged that "[t]he fact that they [are] filed simultaneously cures any problem. There is no need to prefile a draft of a disclosure statement *** It could be one second before, it could be simultaneously." The only legislative purpose of pre-filing disclosure, according to Ackley's counsel, was to make sure that someone was not acting under compulsion of a subpoena. Ackley's counsel admitted, however, that they could not locate the draft complaint and disclosure statement said to have been sent to Joseph and Sheehan.

At the close of argument, the Court took the matter under advisement.

Then, on May 4, 1999, without leave of Court,[20] Ackley submitted yet another supplemental pleading, this one attaching a draft disclosure statement dated August 2, 1995, together with a draft complaint of the same date. These, Ackley's counsel said, confirmed Raspanti's supplemental affidavit that the draft statements sent to the Government on August 2, 1995 were identical to the statements actually filed on September 7, 1995. "These documents which were finally obtained from storage," Ackley's counsel wrote, "confirm that IBM's contention that Mr. Ackley has not complied with any 'pre-filing' requirements of the False Claims Act is without merit."

Again Defendants, "by passion driven,"[21] took issue. Why did Ackley previously represent to the Court that "IBM has received all disclosure statements of any nature" when the supplemental filing obviously proved this to be untrue? Why had Ackley not come forward with the draft disclosure statement long before

then? Why did Ackley offer no explanation to the Court for this delay?[22]

Ackley responded that the Court had full authority to consider evidence relating to its subject matter jurisdiction at any time and that Magistrate Judge Day had found that in good faith he had fully complied with the Court's Scheduling Order of July 6, 1998 as well as with any subsequent orders regarding discovery. He argued that there could be no conceivable element of either bad faith or prejudice to IBM. Indeed, according to Ackley, IBM had never requested the August 2, 1995 draft document.

Defendants, dissenting sharply, pointed out that they had been seeking all disclosure documents since the Court granted the jurisdictional discovery in the summer of 1998. As to Magistrate Judge Day's Order that Ackley was to provide copies of all disclosure documents within 10 days of March 24, 1999, Defendants argued that Ackley had simply ignored that request. Ackley, they said, did not even begin to search his "storage" for the documents until more than a month following that order, after the briefing and after oral argument on the Motion to Dismiss. Nothing in Magistrate Judge Day's ruling, they argued, condoned Ackley's failure to produce in timely fashion the draft disclosure statements that had apparently been in his possession all along.

And so the matter has reposed since that time.

B) The Court finds this chain of events troubling. Whatever the latest documents may establish as regards Ackley's fulfillment of the voluntary disclosure before filing requirement, they come many months after they should have been dis-

---

**20.** Shortly thereafter Ackley did ask for leave to submit the supplemental filing.

**21.** From Robert Burns, "The Vision."

**22.** Defense counsel also noted that included in the Supplemental Filing was a copy of Raspanti's letter to Joseph dated August 2,

1995, which, for the first time, included a second page showing that a copy of the letter and the draft complaint and disclosure statement had also been mailed to Ackley on that date. In other words, it appeared that Ackley had had copies of the critical documents all along.

closed. All along, moreover, the documents appear to have been in the custody of Ackley's prior counsel if not Ackley himself, but in any event in someone's custody and in storage at some place from which they could have been retrieved a considerable time ago. Inexplicably Ackley failed to comply with outstanding discovery orders of the Court, failed to demonstrated his diligence in searching for the documents, and now well after relevant discovery has closed, briefs have been filed, and the issue argued, he asks that his late-discovered proof be received. The Court will not permit it. Defendants' Motion to Strike the documents will be granted.

What remains in the record is too thin. The first Raspanti affidavit, referring as it does simply to a draft complaint and disclosure statement, does not pass muster. It gives no idea at all of what information might have been disclosed by Ackley prior to the filing of suit. Assuming its admissibility,[23] the second Raspanti affidavit does little better. It still gives Defendants no idea of the nature and extent of the pre-filing disclosures.

 The actual draft complaint and disclosure statement that arrived later still and without leave of Court will be excluded from consideration. The principle involved is too sizeable to ignore. These documents were not merely relevant; they were central to establishing one of the principal prerequisites that would permit Ackley to pass through the jurisdictional gate. It goes without saying that courts have authority to control the manner in which cases are tried before them, including authority to exclude evidence filed in untimely fashion. *See generally Lujan v. National Wildlife Federation,* 497 U.S. 871, 894–98, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

The Court sees no limiting principle by which it can excuse the extreme neglect and delay by Ackley in the present case without effectively having to approve late filings in virtually every other case. Indeed the late filing in this case—where the documents in question are so clearly critical to the outcome—makes a ruling that the documents will not be received more imperative still.[24]

The issue of false claims against the Government is without question one of considerable importance, not to be lightly side-stepped by a court. On the other hand, the integrity of the Court's discovery process and its scheduling orders have an equal claim on the public interest. In the present circumstances, the latter consideration prevails. The Court is constrained to find on this record that Ackley has not established that he voluntarily disclosed this information to the Government prior to filing suit. Because this jurisdictional element is lacking, the Court will GRANT Defendants' Motion to Dismiss Counts I and II of the Second Amended Complaint.

A separate Order implementing this decision will issue.

### *ORDER*

Upon consideration of Defendants' Renewed Motion to Dismiss Counts I and II of the Second Amended Complaint and Plaintiff's Opposition thereto, it is for the reasons set forth in the accompanying Opinion this 17th day of November, 1999

ORDERED:

1) Defendants' Motion is GRANTED;

2) Counts I and II of the Second Amended Complaint are DISMISSED;

3) Except for Defendants' Motions to Strike (which are the subject of a separate

---

**23.** The Court, as a formal matter, will strike the second Raspanti affidavit as well.

**24.** The Court wishes to make clear that it is not imposing a sanction for failure to make discovery. *Compare, e.g., Sadler v. Dimen-* *sions Health Corp.,* 178 F.R.D. 56, 58–60 (D.Md.1998). What is involved here is a failure of timely proof of a jurisdictional fact by the party having the burden of proving the fact.

Order entered simultaneously herewith), all other pending Motions are rendered MOOT.

### ORDER

Upon consideration of Defendants' Motions to Strike various documents, it is for the reasons set forth in the accompanying Opinion this 17th day of November, 1999

ORDERED:

1) Defendants' Motions are hereby GRANTED;

2) The Second Affidavit of Marc Raspanti is STRICKEN;

3) The Complaint and Disclosure Statement, covered by a draft letter dated August 2, 1995 from Raspanti to Joseph, are STRICKEN.