682

UNITED STATES of America ex rel. Bruce G. LOWMAN, M.D., Plaintiffs,

v.

HILTON HEAD HEALTH SYSTEM, L.P.; Tenet Healthcare Corporation f/k/a National Medical Enterprises and American Medical International; Tenet Physician Services—Hilton Head, Inc.; Hilton Head Medical Group—Cardiology, L.L.C.; and James Douglas Johnston, M.D., individually and as a member of the Medical Staff, Defendants.

C.A. No.: 9:05–2533–PMD.

United States District Court, D. South Carolina, Beaufort Division.

April 24, 2007.

Andrew D. Gowdown, Richard S. Rosen, Rosen Rosen and Hagood, Charleston, SC, Jennifer J. Aldrich, U.S. Attorneys Office, Columbia, SC, Andrew M. Beato, Gerard E. Mitchell, Robert F. Muse, Stein Mitchell and Mezines, Washington, DC, for Plaintiffs.

E. Douglas Pratt–Thomas, Pratt–Thomas Pearce Epting and Walker, Charleston, SC, Brian R. Stimson, William H. Jordan, Alston and Bird, Atlanta, GA, Hutson Sanford Davis, Jr., McNair Law Firm PA, Bluffton, SC, Andrew G. Melling, McNair Law Firm, Columbia, SC, for Defendants.

### ORDER

DUFFY, District Judge.

This matter is before the court upon two Motions to Dismiss, one filed by Defen-

dants Tenet Physician Services—Hilton Head, Inc.; Hilton Head Medical Group—Cardiology, L.L.C.; Hilton Head Health System L.P.; and Tenet Healthcare Corporation (collectively "Hospital Defendants") and another filed by Defendant James Douglas Johnston ("Johnston"). For the reasons set forth herein, the court converts these motions to Motions for Summary Judgment and grants Defendants' motions.

## BACKGROUND

Relator Bruce G. Lowman, M.D. ("Lowman" or "Plaintiff") filed a complaint against Hilton Head Medical Center and Clinics ("HHMCC") and other corporate entities under the *qui tam* provisions of the federal False Claims Act ("FCA") on September 1, 2005. *See* 31 U.S.C. § 3729 *et seq.* Dr. Lowman was employed by Defendant HHMCC as a vascular surgeon beginning on or about March 10, 1997, and he is a former Director of the hospital's Vascular Laboratory. (Compl.¶ 9.) Lowman alleges that several days after he began working for HHMCC, he was summoned to a private meeting with HHMCC's President and CEO Dennis Bruns, in which Bruns told Lowman that Dr. James Johnston[1] "regularly performed medically unnecessary therapeutic cardiac catheterizations (including angioplasties and stents) on patients in non-emergent circumstances even though De-

fendant HHMCC did not have open heart surgery facilities." (Compl.¶¶ 58–59.)[2] According to Plaintiff, Bruns "characterized the problem as 'very delicate' because Defendant Johnston and the Catheterization Laboratory generated a substantial amount of revenue for Defendants." (Compl.¶ 60.)

Lowman further alleges that Bruns "said he wanted Dr. Lowman to be his 'eyes and ears' in the Catheterization Laboratory regarding Defendant Johnston's procedures and report what Dr. Lowman observed." (Compl.¶ 66.) Lowman states he reported to Bruns and Dr. Kunze, HHMCC's Medical Director, regarding the medically unnecessary procedures of Defendant Johnston and the Catheterization Laboratory, including Dr. Johnston's partner, Dr. Paul Slota. (Compl.¶ 67.) Plaintiff's complaint further alleges that hospital administrators asked him to review medical records of patients treated by Johnston and Slota and that he conducted such a review with several other physicians, including Dr. Kaup, Dr. Lens, Dr. Platt, Dr. Trotter, and Dr. Hart. (Compl.¶ 68.) The Complaint states,

Hundreds of medical records were examined by Dr. Lowman and other physicians as part of the review. As many as two-thirds of the records indicated that therapeutic cardiac catheterizations or peripheral catheterizations were per-

---

**1.** Dr. Johnston was employed, beginning in 1993, by HHMCC, and Johnston served as Director of HHMCC's Catheterization Laboratory during all relevant times. (Compl.¶ 20.)

**2.** The South Carolina Department of Health and Environmental Control ("DHEC") administers the South Carolina State Certification of Need and Health Facility Licensure Act. *See* S.C. Code Ann. § 44–7–110 *et seq.* The Act requires health care facilities to obtain a Certificate of Need before undertaking, *inter alia,* the construction of a new health care facility or offering certain health services

which the facility has not offered in the preceding twelve months. *See* S.C. Code Ann § 44–7–160. Both parties agree that in 1995, the State Health Plan promulgated by DHEC indicated that cardiac catheterization labs could perform diagnostic procedures but could not perform therapeutic cardiac catheterizations unless the hospital also had an open-heart surgery capability. HHRMC did not receive its Certificate of Need for open-heart surgery until July 2002. (Compl. ¶ 73; Hospital Defs.'s Mem. in Supp. at 4–5.)

formed by Defendant Johnston and/or the Catheterization Laboratory in circumstances which were medically unnecessary and/or non-emergent.

(Compl.¶ 69.) Lowman alleges many of the Defendants' agents and employees knew of the unnecessary procedures being performed, including W. Randolph Smith, a senior officer of Defendant Tenet Healthcare Corporation; Kathy Meyers, former Nurse Director of the Catheterization Laboratory; Andrea Wozniak, HHMCC's Chief Operating Officer; and David O'Conner, HHMCC's Chief Financial Officer. (Compl.¶¶ 70–71.)

Dr. Lowman also alleges that while at HHMCC, the hospital developed an extended care and rehabilitation program, including a cardiopulmonary program. According to Lowman, hospital administrators pressured him and other medical staff to fill the additional beds regardless of whether patients required rehabilitation services. (Compl.¶ 87.) When he questioned this procedure, hospital administrators told Lowman "to chart his patients as needing physical therapy or rehabilitation so that Defendant HHMCC would be reimbursed for the services." (Compl.¶ 87.) Lowman alleges "[u]pon information and belief" that Defendants billed Medicare for extended care and rehabilitation services for patients without a medical necessity. (Compl.¶ 88.)

In addition, Lowman alleges Defendants "routinely engaged in fraudulent coding by misrepresenting the level of service provided and/or misrepresenting the type of service provided." (Compl.¶ 89.) According to Plaintiff, HHMCC required its medical staff to chart all of a patient's medical conditions, even if the patient was not treated for that condition, and as a result, Medicare reimbursed HHMCC for treatment the hospital did not provide. (Compl.¶ 91.) Defendant HHMCC then concealed this wrongdoing by falsifying or knowingly failing to disclose these procedures in the Joint Annual Report of Hospital ("JARS") forms. (Compl.¶ 93.) Additionally arguing HHMCC did not meet the definition of a "hospital," Plaintiff alleges Defendants "were not authorized to bill Medicare for the performance of services or procedures that violated the statutory and regulatory prerequisites of the Federal healthcare program." (Compl.¶ 102.)

Plaintiff's complaint lists five causes of action, all brought pursuant to the False Claims Act: (1) False Claims Act: Presentation of False Claims, (2) False Claims Act: Making or Using False Record or Statement to Cause False Claim to be Paid, (3) False Claims Act: Conspiring to Submit False Claims, (4) False Claims Act: Making or Using a False Record or Statement to Avoid an Obligation to Refund, and (5) False Claims Act: Improper Coding. The Hospital Defendants filed a Motion to Dismiss on December 22, 2006, and Defendant Johnston filed a Motion to Dismiss on January 12, 2007. Defendants filed these motions pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6).

## STANDARD OF REVIEW

### A. Rule 12(b)(6)

A Rule 12(b)(6) motion should be granted only if, after accepting all well-pleaded allegations in the complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claims that entitles him to relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). The complaint should not be dismissed unless it is certain that the plaintiff is not entitled to relief under any legal theory that plausibly could be suggested by the facts alleged. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130,

1134 (4th Cir.1993). Further, "[u]nder the liberal rules of federal pleading, a complaint should survive a motion to dismiss if it sets out facts sufficient for the court to *infer* that all the required elements of the cause of action are present." *Wolman v. Tose,* 467 F.2d 29, 33 n. 5 (4th Cir.1972).

Under this rule, "when matters outside the pleadings are submitted with a motion to dismiss for failure to state a claim upon which relief can be granted ..., the motion shall be treated as one for summary judgment...." *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir.1985) (internal quotation marks omitted). All parties must be given a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). The Fourth Circuit has stated that a "reasonable opportunity" means "some indication by the court to all parties that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery." *Johnson v. RAC Corp.,* 491 F.2d 510, 513 (4th Cir.1974) (internal quotation marks and citations omitted). "When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment." *Gay,* 761 F.2d at 177.

### B. Rule 12(b)(1)

In general, when evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the complaint fails to state facts upon which jurisdiction can be founded, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). The plaintiff has the burden of proving jurisdiction, and the court may go beyond the face of the complaint and consider evidence without converting the motion into one for summary judgment. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991). However, if the evidence is disputed, the court may weigh and determine the facts. *See Thigpen v. United States,* 800 F.2d 393, 396 (4th Cir.1986), *overruled on other grounds, Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988). "When jurisdictional facts are disputed, no presumption of truthfulness attaches to the plaintiff's allegations." *U.S. ex rel. Ackley v. Int'l Bus. Machs. Corp.,* 76 F.Supp.2d 654, 659 (D.Md.1999) (citing *Commodity Trend Serv., Inc. v. Commodity Futures Trading Commission,* 149 F.3d 679, 685 (7th Cir.1998)).

### C. Rule 56

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

## ANALYSIS

Congress originally passed the False Claims Act during the Civil War "in response to overcharges and other abuses by defense contractors," intending that the Act "and its *qui tam* action would help the government uncover fraud and abuse by unleashing a 'posse of *ad hoc* deputies to uncover and prosecute frauds against the government.'" *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (quoting *U.S. ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 49 (4th Cir.1992)). In relevant part, the Act provides,

(a) Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false and fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]

. . .

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a). The Act defines "knowingly" to mean that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." *Id.* § 3729(b).

### A. Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants first move to dismiss Plaintiff's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting Plaintiff has failed to plead facts that demonstrate the court has subject matter jurisdiction to hear his claims. (Hospital Defs.'s Mot. at 1–2.) More specifically, Defendants argue the court should grant their Motion to Dismiss because Plaintiff's complaint is based on publicly-disclosed information and Plaintiff has failed to demonstrate he is an "'original source' having direct and independent knowledge of the information in his Complaint and that he provided the information to the government before filing his action." (Hospital Defs.'s Mem. in Supp. at 14–15.)

■ With 31 U.S.C. § 3730(e)(4), Congress sought to strike a balance between encouraging private enforcement suits and preventing " 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud." *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir.1994). Section 3730(e)(4) in relevant part provides,

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4). In the Fourth Circuit, the phrase "based upon" means "derived from." *Siller*, 21 F.3d at 1348. Thus, even if a prior suit "includes allegations that happen to be similar (even identical) to those already publicly disclosed," if the relator's action is not "actually derived from those public disclosures," then

the suit is not based upon the public disclosure. *Id.*

■ Section 3730(e)(4) thus requires this court to answer three questions:

(1) Have allegations made by the relator been "publicly disclosed" before the qui tam suit was brought? (2) If so, is the qui tam suit "based upon" the public disclosure? and (3) If so, was the relator an "original source" of the information on which the allegations were based? Jurisdiction exists only if the answer to one of the first two questions is "no" or the answer to the third question is "yes."

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1042 (8th Cir.2002); *see also U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F.Supp.2d 824, 841 (S.D.Tex. 2003).

### 1. Whether Allegations Made by Relator Were "Publicly Disclosed"

■ Defendants first argue this court does not have jurisdiction because the allegations made by Plaintiff were publicly disclosed before he brought the qui tam suit.[3] According to Defendants, not only does Plaintiff " 'derive[ ]' his allegations from publicly-disclosed information, but he expressly incorporates this information into the text of his allegations." (Hospital Defs.'s Mem. in Supp. at 14 (citation omitted).) Defendants argue Plaintiff's allegations are based on information disclosed in an administrative hearing before DHEC and information disclosed in the news media. (Hospital Defs.'s Mem. in Supp. at 15–16.)[4] On the other hand, Plaintiff ar-

---

3. As previously noted, in considering a motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the court may go beyond the face of the complaint and consider evidence without converting the motion into

one for summary judgment. *Richmond*, 945 F.2d at 768.

4. According to Defendants, a Consent Order qualifies as an administrative hearing under § 3730(e)(4). The Consent Order arises out

gues the Consent Order is not an administrative hearing under the FCA or state law. (Pl.'s Mem. in Opp'n at 17.) Plaintiff also argues the coverage in the news media does not bar his claims because he provided the information on Defendants' malfeasance years before any news coverage and that his allegations therefore "cannot be 'actually derived' from media." (Pl.'s Mem. in Opp'n at 19.)

While both parties vigorously argue over whether the Consent Order is an administrative hearing, the court need not determine whether the actual order is a public disclosure because news media coverage constitutes public disclosure, and the news media extensively covered the terms of the Consent Order. *See* 31 U.S.C. § 3730(e)(4)(A); *see also Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir.2000) ("To be publicly disclosed, the information must be conveyed in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." (internal quotation marks omitted)). An article in the *Hilton*

*Head Island Packet* dated November 14, 2004 disclosed the following:

For more than three years, heart patients at Hilton Head Regional Medical Center underwent 242 invasive cardiac procedures strictly forbidden by state health rules, records show.

During that period, from Jan[uary] 1, 1997 to March 31, 2000, the hospital also sent state health authorities reports that obscured the fact that the procedures had been done.

The procedures were "non-emergent therapeutic cardiac catheterizations"— called "caths" in medical shorthand. The hospital admitted to the state Department of Health and Environmental Control in July 2000 that the caths had been done and misidentified on the reports, according to records. DHEC, which oversees health care in South Carolina, accepted the hospital's word that it hadn't intentionally violated any rules and fined it $24,200, according to a February 2001 legal settlement.

. . .

The unauthorized therapeutic caths were performed in the hospital's cardiac

---

of HHMCC's performance of therapeutic cardiac catheterizations when the hospital did not provide open-heart surgery; HHMCC voluntarily reported its non-compliance with the State Health Plan to DHEC on July 26, 2000. (*See* Hospital Defs.'s Mem. in Supp. Ex. 2 at 2.) The Consent Order states,

3. One of the standards for cardiac catheterization laboratories as outlined in the *1994 South Carolina Health Plan* and subsequent health plans, states that diagnostic cardiac catheterization laboratories shall not be allowed to perform ... therapeutic procedures. Therapeutic cardiac catheterizations can only be performed in hospitals that provide open-heart surgery.

4. On July 26, 2000, Mr. Dennis Bruns, Hilton Head President and CEO, informed the Department that therapeutic cardiac catheterizations had been performed in non-emergent situations since 1997. These

procedures were not reported in the Joint Annual Reports submitted to [DHEC] each year.

5. Based on a report submitted to ... [DHEC] dated December 11, 2000, therapeutic cardiac catheterizations were performed in 436 cases from the period beginning January 1, 1997 through March 31, 2000.

6. Of these therapeutic catheterizations, Hilton Head has also reported to ... [DHEC] that 242 procedures were performed on patients in non-emergent circumstances during the period at issue.

(Hospital Defs.'s Mem. in Supp. Ex. 2 at 2.) Pursuant to this order, HHMCC paid DHEC a civil penalty in the amount of $24,200, which represented a $100 fine for each of the 242 non-emergent therapeutic catheterizations. (Hospital Defs.'s Mem. in Supp. Ex. 2 at 3–4.)

cath lab, whose director at the time was Hilton Head Island cardiologist James D. Johnston, according to the hospital. Johnston was one of the cath lab's main users while he was director, from 1996 until August 2001, according to records and interviews....

Johnston and his lawyers have declined repeated requests for interviews. The doctor has been barred from practicing in the state until he is treated for an alcohol abuse problem. He also faces federal charges of posing as an American citizen although he was born in Canada. Johnston pleaded not guilty to the charge on Oct[ober] 28.

Over the past seven months, The Island Packet has examined hundreds of pages of documents and interviewed scores of people.... The Packet's review showed:

...

● In addition to the 242 therapeutic caths resulting in fines, the hospital did another 194 during the 39–month period. DHEC didn't levy fines for these because the hospital said they were necessitated by emergencies. DHEC's rules contained no exception allowing therapeutic caths in emergencies....

● After the $24,200 fine, the hospital continued doing therapeutic caths for two and a half years, until its open-heart program began. These caths also were necessitated by emergencies, according to the hospital.

● The hospital told DHEC that the unauthorized caths were "discovered" three years after they began, but it's not clear how they were overlooked before that.

● The hospital repeatedly submitted inconsistent facts and figures about its

cardiac procedures to DHEC, which rarely questioned the data.

● Ambulances from the Town of Hilton Head Island were routinely summoned to the hospital by the cardiac cath lab staff and parked outside the hospital, waiting on standby while therapeutic caths were done....

(Hospital Defs.'s Mem. in Supp. Ex. 7.) [5]

The November 14 article also refers to the Primary Angioplasty in Acute Myocardial Infarction, No Surgery–on–Site Study, also known as the "PAMI No SOS" trials. According to the article, this study addressed the issue of whether heart attack victims are better off getting therapeutic catheterizations immediately, even if the hospital does not have the capability to perform open-heart surgery, or whether they should instead be transferred to a hospital with an open-heart surgery unit for the procedure. An article on the study was published in a cardiology journal; the journal article stated that states prohibiting therapeutic catheterizations in hospitals without open-heart surgery units were prohibited from participating in the PAMI No SOS trials. As the November 14 article reports, however, HHMCC participated anyway, and of the nineteen participating hospitals, HHMCC enrolled the most patients. (Hospital Defs.'s Mem. in Supp. Ex. 7.)

Lastly, the November 14 article states, "Reports sent by the hospital to DHEC each year also raise questions about how hospital officials could have been unaware of the therapeutic caths." (Hospital Defs.'s Mem. in Supp. Ex. 7.) On the reports, hospitals are asked to indicate the number of diagnostic catheterizations, therapeutic catheterizations, and "all other" procedures, which is "a catch-all for

---

**5.** *See* Fitz McAden & Jessica Flathmann, *Heart Problems: Hilton Head's Hospital Admitted That It Performed Cardiac Procedures* *Without Required Safeguards,* Hilton Head Island Packet, Nov. 14, 2004.

minor, non-invasive procedures." (Hospital Defs.'s Mem. in Supp. Ex. 7.) The November 14 article describes how the hospital did not properly report these procedures:

> In 1997, the hospital skipped over the lines on the form where the number of therapeutic caths should have been entered, and instead lumped that year's 221 therapeutic caths into the "all other" category. Similarly, in the 1998 report, the hospital listed only two of its 267 therapeutic caths properly, putting the other 265 into the "all other" category. The next year, too, the hospital reported only four of 356 therapeutic caths accurately, putting the rest in "all other."
>
> The hospital sent DHEC corrected reports on Sept[ember] 6, 2000, two months after it disclosed the unauthorized caths.

(Hospital Defs.'s Mem. in Supp. Ex. 7.)

As this article from the *Hilton Head Island Packet* was published in November 2004, and Plaintiff did not file suit until September 2005, the court finds the first question required pursuant to § 3730(e)(4), whether allegations made by the relator have been publicly disclosed before the qui tam suit was brought, must be answered in the affirmative.

**2. Whether the Qui Tam Suit is Based upon the Public Disclosure**

■ The next question in the § 3730(e)(4) jurisdictional inquiry is whether the qui tam suit is based upon the public disclosure. As previously noted, in the Fourth Circuit,

> [A] relator's action is "based upon" a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based. Such

an understanding of the term "based upon," apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s indisputed objective of preventing "parasitic" actions, for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.

*Siller,* 21 F.3d at 1348 (citation omitted).

Defendants argue Plaintiff's allegations are based on information disclosed in the news media. (Hospital Defs.'s Mem. in Supp. at 16.) Defendants state, "Relator's Complaint that he filed months after these articles [6] were published simply lifts wholesale much of the information that is set forth in those stories as the basis for his FCA claims." (Hospital Defs.'s Mem. in Supp. at 17.) Defendant also asserts Plaintiff "expressly incorporates the PAMI Study from the *Journal of the American College of Cardiology* in his Complaint as a basis for his claims that [therapeutic cardiac catheterizations] were being performed by Johnston at HH[M]CC and that the hospital knew that Dr. Johnston was not in compliance with the applicable regulations." (Hospital Defs.'s Mem. in Supp. at 17–18.) Plaintiff argues his suit is not based on public disclosures; he states that he contacted the United States Attorney regarding the allegations in his Complaint in early November 2002 and that his allegations thus cannot be actually derived from the media. (*See Compl.* ¶ 5; Pl.'s Decl. ¶ 4.) Plaintiff further states,

> [E]ven a cursory comparison [of the newspaper articles to his Complaint] demonstrates that the false claims are independent of the articles:

**6.** The *Hilton Head Island Packet* published several other articles potentially relevant to the case *sub judice.* The court finds it unnec- essary to describe the contents of the other articles, however, as the additional articles do not affect the court's analysis.

● Medically unnecessary therapeutic cardiac catheterizations were not disclosed in the articles, but are alleged in the Complaint.

● Medically unnecessary peripheral catheterizations were not disclosed in the articles, but are alleged in the Complaint.

● Medically unnecessary rehabilitation services were not disclosed, but are alleged in the Complaint.

● Medically unnecessary tests related to the peripheral and cardiac cathetherizations were not disclosed, but are alleged in the Complaint.

● False billing was not disclosed, but is alleged in the Complaint.

(Pl.'s Mem. in Opp'n at 20.) In Reply, Defendants state that the JARS HHMCC filed and the PAMI No SOS Study are public sources and that these sources are "integral" to Plaintiff's claims. (Hospital Defs.'s Reply at 3.) Furthermore, Defendants argue that while Plaintiff complains of medically unnecessary catheterizations,[7] the basis for this allegation is that the catheterizations were performed in non-emergent circumstances and without on-site open-heart surgery capability, a fact which was disclosed in the news media. (Hospital Defs.'s Reply at 4.)

Plaintiff does allege facts in his Complaint that have not been publicly disclosed, and these allegations thus cannot be based on the public disclosure. However, many of the facts Plaintiff alleges in his 2005 Complaint appeared in the *Hilton Head Island Packet* in 2004. In *Siller*, the Fourth Circuit vacated the part of the district court's order that dismissed Siller's complaint as "based upon" the allegations of a previous lawsuit. *See Siller*, 21 F.3d at 1355. The court said,

> It is not clear to us that the district court found that Siller actually derived the allegations in his *qui tam* action from the [previous] complaint.... That the facts that were disclosed in the [previous] complaint and the facts that formed the basis for Siller's action were the same, does not, however, mean that Siller actually derived his allegations from the allegations in the [previous] complaint. It is certainly possible that, as Siller contends, Siller actually learned of BD's alleged fraud entirely independently of the [previous] suit, and derived his allegations from that independent knowledge.

*Id.* at 1349. "*Siller*, however, offers no guidance on the issue of whether, for the [public disclosure] bar to apply, the information derived by the relator must be total or need only be partial." *Ackley*, 76 F.Supp.2d at 660. The United States District Court for the District of Maryland has held "that allegations partially based upon (*i.e.* partially derived from) public disclosures suffice for imposition of the public disclosure bar." *Id.* at 662. The *Ackley* court said, "This view ... accords with the holding of every Circuit that has addressed the issue.... The Court, moreover, believes practical considerations favor application of a 'partially based on' rule." *Id.* at 661.[8] The court is persuaded

---

7. The *Hilton Head Island Packet* did not report any medically unnecessary catheterizations.

8. The court elaborated on the practical considerations: adopting a "partially based upon" rule will prevent a relator from proceeding simply adding a few previously undisclosed facts to numerous facts previously disclosed. *Ackley*, 76 F.Supp.2d at 661. Furthermore, "a potential logistical nightmare would ensue" if the court had to "pick and choose among those facts derived from public disclosures and those not so derived, and then to try the case requiring proof of direct and independent knowledge as to some facts but not as to others-particularly in cases where many facts and transactions are likely to be interwoven." *Id.*

by the reasoning in *Ackley;* thus, if any part of Plaintiff's complaint is based on public disclosures, Plaintiff must demonstrate he is an original source in order for this court to have jurisdiction.

It is true that several of the allegations in Plaintiff's complaint are substantially similar to the facts reported in the *Hilton Head Island Packet.* However, as the Fourth Circuit's opinion in *Siller* instructs, the similarity of the facts in the relator's complaint and the public disclosure does not indicate the relator's action is based on the public disclosure. *Siller,* 21 F.3d at 1348–49. Plaintiff presents evidence that he spoke with a United States Attorney prior to the articles appearing in the *Hilton Head Island Packet.* In his declaration, Plaintiff states,

> In November 2002 or thereafter, I notified the United States Attorney for the District of South Carolina of Defendants' false claims. The initial contact was made on or about November 6, 2002. I spoke with United States Attorney Jennifer Aldrich by telephone and described the allegations now reflected in the Complaint. Subsequently I had additional discussions with Ms. Aldrich and an investigator from the Office of [the] Inspector General, Mr. Brian Dimmler.

(Pl.'s Decl. ¶ 4.) Plaintiff thus states, under penalty of perjury, that he spoke with a United States Attorney in November 2002 and "described the allegations now reflected in the Complaint." (Pl.'s Decl. ¶ 4.)

Furthermore, Plaintiff's Complaint alleges wrongdoing never mentioned in the *Hilton Head Island Packet.* For example, Plaintiff alleges HHMCC developed an extended care and rehabilitation program during his tenure there. (Compl.¶ 87.) He states that hospital administrators pressured him and HHMCC's medical staff to fill the beds regardless of whether patients required those services and alleges upon information and belief that Defendants billed Medicare for these services without medical necessity. (Compl.¶ 87.) In addition, Plaintiff alleges HHMCC, in requiring its medical staff to chart every medical condition of the patient as being treated regardless of whether or not the condition actually was treated, improperly billed Medicare for services not provided. (Compl.¶ 91.) He states he has knowledge of Johnston's wrongdoing as a result of a conversation he had with Bruns shortly after starting work at HHMCC and participation in the internal review committee. (Pl.Decl.¶¶ 18–20, 27.) Dr. Lowman further alleges that he discontinued referring his patients to Johnston and HHMCC's Catheterization Laboratory and instead began referring them to the Department of Radiology as a result of the wrongful procedures. However, Bruns notified Plaintiff that his patients should not be referred to the Department of Radiology because it was not owned by Defendants and therefore drained money away from them. (Compl.¶ 84.)

Several factors weigh in favor of finding Plaintiff's Complaint is not based on public disclosure. First, Plaintiff submits evidence that he reported the factual allegations contained in his Complaint to a United States Attorney in 2002, prior to the articles in the *Hilton Head Island Packet.* Second, Plaintiff's Complaint and Declaration reveal how he could have learned of Defendants' malfeasance as a result of his position with HHMCC. Lastly, the Complaint alleges malfeasance far beyond what is contained in the newspaper articles. This is not a case where Plaintiff simply lifted his allegations from a public disclosure. The court therefore has jurisdiction over Plaintiff's suit because the court finds the *qui tam* suit is not based upon the public disclosure. *See* 31 U.S.C. § 3730(e)(4); *see also Minn. Ass'n of*

*Nurse Anesthetists,* 276 F.3d at 1042; *Reagan,* 274 F.Supp.2d at 841.

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)[9]

Defendants argue the court should grant their Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for two reasons: (1) even if Plaintiff's allegations are true, "a violation of state [Certificate of Need] regulations is not and cannot be a false claim;" and (2) the statute of limitations precludes Plaintiff's False Claims Act causes of action premised on alleged violations occurring on or before September 1, 1999. (Hospital Defs.' Mot. at 2.) Plaintiff, on the other hand, argues that false certifications to Medicare are actionable and that Defendants falsely certified their compliance with the law. (Pl.'s Mem. in Opp'n at 28.) Plaintiff also argues the court should not grant the Motion to Dismiss because Plaintiff brought this action within the statutory time period. (Pl.'s Mem. in Opp'n at 31.)

The statute of limitations provision of the False Claims Act provides as follows:

A civil action under section 3730 may not be brought-

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b).

Courts disagree over whether *qui tam* plaintiffs may take advantage of the equitable tolling provision codified in § 3731(b)(2). Some courts hold that the tolling provision is inapplicable to *qui tam* plaintiffs. *See U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702, 725–26 (10th Cir.2006); *U.S. ex rel. Amin v. George Washington Univ.,* 26 F.Supp.2d 162, 172 (D.D.C.1998) ("The plain meaning of the statute supports the conclusion that the three year knowledge requirement contained in 31 U.S.C. § 3731(b)(2) only applies to cases in which the government intervenes."); *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.,* 6 F.Supp.2d 263, 265 (S.D.N.Y. 1998) ("By the clear statutory language, the Relator's time is not extended to three years after the United States official learns of the violation. That provision only applies to the government."). Other courts have held that the tolling provision in § 3731(b)(2) applies to cases brought by relators. *See U.S. ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1216 (9th Cir. 1996) ("[W]e conclude that Congress did not intend to restrict the tolling provisions of the [False Claims] Act to apply to suits brought by the Attorney General alone, but intended the tolling provision to apply to *qui tam* plaintiffs as well."); *U.S. ex rel. Downy v. Corning, Inc.,* 118 F.Supp.2d 1160, 1170 (D.N.M.2000) (adopting the *Hyatt* approach);[10] *U.S. ex rel. Bidani v. Lewis,* No. 97 C 6502, 1999 WL 163053, at *9 (N.D.Ill. Mar. 12, 1999) ("[Section] 3731(b)(2) is construed as applying to ac-

**9.** Because matters outside the pleadings are presented to and not excluded by the court, the court will treat the Motions to Dismiss pursuant to Rule 12(b)(6) as Motions for Summary Judgment.

**10.** The United States Court of Appeals for the Tenth Circuit did not adopt this approach in *Sikkenga.* *See* 472 F.3d 702. Instead, the Tenth Circuit held that § 3731(b)(2) "was not intended to apply to private qui tam relators at all." *Id.* at 725.

tions brought by a qui tam plaintiff and in which the government has not joined. In such cases, the three-year knowledge rule is measured by the knowledge of the qui tam plaintiff."). Furthermore, one district court has held that § 3731(b)(2) applies to private relators and that the three-year period begins to run not when the relator has knowledge of the violation but when knowledge of that violation is communicated to the appropriate United States official. *See U.S. ex rel. Colunga v. Hercules*

*Inc.*, No. 89–CV–954 B, 1998 WL 310481, at \*3–4 (D.Utah Mar. 6, 1998).[11]

■ This court need not decide whether the equitable tolling provision codified in § 3731(b)(2) applies to actions brought by *qui tam* plaintiffs because assuming the provision applies, Plaintiff's claims are still barred by the statute of limitations. In his Memorandum in Opposition to Defendants' Motions to Dismiss, Plaintiff frequently cites *Hyatt* and asserts that while the Fourth Circuit has not ruled on the issue, "it appears aligned with *Hyatt.*" (Mem. in Opp'n at 33.)[12] Plaintiff, however, fails to

---

**11.** The United States Court of Appeals for the Tenth Circuit did not adopt this approach in *Sikkenga*. *See* 472 F.3d 702. Instead, the Tenth Circuit held that § 3731(b)(2) "was not intended to apply to private qui tam relators at all." *Id.* at 725.

**12.** Plaintiff cites *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center*, 961 F.2d 46 (4th Cir.1992), for support in asserting that the Fourth Circuit appears aligned with *Hyatt*. Plaintiff states,

[T]he FCA is concerned solely with false claims submitted to the Government and provides for suit brought by individuals, but only as relators in the name of the Government. These and other considerations compelled the court to hold that the United States is the real party in interest in any FCA suit, even where it permits a *qui tam* relator to pursue the action on its behalf. (Pl.'s Resp. in Opp'n at 33 (internal quotation marks and citations omitted).)

In *Milam*, the issue before the court was "whether the inapplicability of the Eleventh Amendment to suits brought by the United States extends to actions brought on the United States' behalf by *qui tam* relators." *Milam*, 961 F.2d at 47. The relator filed suit against M.D. Anderson Cancer Center of the University of Texas (the "Center"), and the relator did not contest the Center's assertion that it was an agency of the State of Texas. *Id.* at 48. The Center moved to dismiss, arguing immunity pursuant to the Eleventh Amendment, but the district court denied the motion. *Id.*

On appeal, the Fourth Circuit affirmed the district court and stated,

When a *qui tam* action is brought on its behalf, the government may choose to intervene and pursue the action itself or to per-

mit the relator to pursue the action without its intervention. Whichever course it chooses, the government is entitled to the lion's share of any amount recovered.

. . .

We hold that the United States is the real party in interest in any False Claims Act suit, even where it permits a *qui tam* relator to pursue the action on its behalf. The Center's Eleventh Amendment immunity defense therefore evaporates, because states may be sued in federal courts by the United States.

*Id.* at 48, 50.

The court is not persuaded by the holding in *Milam* to hold that Plaintiff has three years after he notifies the appropriate United States official to bring his *qui tam* action, even when he has been aware of the alleged fraud for more than six years. As Plaintiff notes, the Fourth Circuit has not decided the issue. *Milam* did not address the False Claims Act's statute of limitations at all; the issue was whether the inapplicability of the Eleventh Amendment to suits brought by the United States extends to actions brought by *qui tam* relators. *Milam*, 961 F.2d at 47. Furthermore, as the Ninth Circuit noted in *Hyatt*,

Under this theory, *qui tam* relators could wait a full ten years after learning of the deceit before suing. This would frustrate the purposes of a limitation period and the purposes of the Act. Granting *qui tam* relators the power to wait nearly ten years to sue would allow fraud to continue and losses to mount. Furthermore, allowing a *qui tam* plaintiff to wait ten years might interfere with law enforcement: false claims are subject to criminal prosecution only within five years after the wrongful act is committed. 18 U.S.C. §§ 287, 3282 (1986). If

discuss a relevant portion of the *Hyatt* opinion. In *Hyatt*, the Ninth Circuit held § 3731(b)(2) applies to *qui tam* plaintiffs. *Hyatt*, 91 F.3d at 1216. The court then addressed "what event initiates the running of the statute of limitations against a *qui tam* plaintiff under 31 U.S.C. § 3731(b)(2)." *Id.* Noting the "rationale behind tolling requires that the statute of limitations start to run when the plaintiff acquires knowledge of the wrongful activity," the Ninth Circuit held the plaintiff's cause of action barred because the six-year general limitation period had expired and because his suit was filed more than three years after he knew of the alleged wrongdoing. *Id.* at 1217–18. The court said,

> Once the *qui tam* plaintiff has the requisite information, he cannot sleep on his rights. He is charged with responsibility to act under the circumstances. Thus, as to the *qui tam* plaintiff, the three-year extension of the statute of limitations begins to run once *qui tam* plaintiff knows or reasonably should have known the facts material to his right of action.... Hyatt's interpretation of the tolling provision would permit *qui tam* relators to control the length of their own limitations period by withholding their allegations until they are prepared to sue. Under this theory, *qui tam* relators could wait a full ten years after learning of the deceit before suing. This would frustrate the purposes of a

relators wait over five years to report the fraud, the government will lose the right to seek a criminal penalty.

*Hyatt*, 91 F.3d at 1218. The court is persuaded by this reasoning; a *qui tam* plaintiff should not be permitted to lengthen his or her limitations period by waiting to report the alleged False Claims Act violations to the appropriate official. Thus, a *qui tam* plaintiff

limitation period and the purposes of the Act.

*Id.* at 1217–18.

In the case *sub judice*, Plaintiff began working at HHMCC on or about March 10, 1997, and he states he was summoned to a meeting with Bruns several days after he began working there in which Bruns told Plaintiff about Defendant Johnston's unlawful and unnecessary performance of procedures. (Pl.'s Decl. ¶¶ 17–20.) Plaintiff also states that he was asked to participate in an internal review committee to review Defendant Johnston's files several months after he started working at HHMCC. (Pl.'s Decl. ¶ 27.) Plaintiff resigned his position effective May 14, 1999. (Pl.'s Decl. ¶ 41.) He brought suit pursuant to the False Claims Act on September 1, 2005. Plaintiff thus did not bring his suit within the time frame established by the statute of limitations in 31 U.S.C. § 3731(b). Assuming, but not deciding, the equitable tolling provision applies to Plaintiff,

> [A] civil action under the [False Claims] Act brought by a *qui tam* plaintiff must be commenced no more than (1) six years after the date on which the FCA violation is committed or (2) three years after the date when facts material to the right of action are known or reasonably should have been known by the *qui tam* plaintiff, whichever occurs last. A suit under the Act must, in any event, be brought no more than ten years after the date on which the violation occurred.

must bring his or her action "no more than (1) six years after the date on which the FCA violation is committed or (2) three years after the date when facts material to the right of action are known or reasonably should have been known by the *qui tam* plaintiff, whichever occurs last." *Id.* As 31 U.S.C. § 3731(b) provides, the action must be brought no more than ten years after the violation.

*Hyatt*, 91 F.3d at 1218. Plaintiff knew of the material facts shortly after he began his employment at HHMCC, but he filed this action more than six years after the alleged violations occurred and more than three years after he knew the relevant facts.[13] Even assuming the statute of limitations began to run on May 14, 1999, it has run, and Plaintiff's suit is therefore barred.[14]

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that the Hospital Defendants' Motion for Summary Judgment and Defendant Johnston's Motion for Summary Judgment are **GRANTED**.

**AND IT IS SO ORDERED.**

---

**13.** While Plaintiff asserts that the violations continued after he left HHMCC, he can have no personal knowledge of these alleged violations. *See Foster v. Savannah Comm'n*, 140 Fed.Appx. 905, 907 (11th Cir.2005).

**14.** Finding the statute of limitations determinative, the court does not address Defendants' argument that a violation of a state Certificate of Need regulation cannot be a false claim. Likewise, the court does not address Defendants' argument that Plaintiff failed to plead fraud with particularity.